UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

MICHAEL COLEMAN SAVAGE,

              Plaintiff,

     v.

CITY OF TWIN FALLS, a political
subdivision of the State of Idaho, TWIN
FALLS CITY POLICE DEPARTMENT,
BRIAN PIKE, CHIEF OF POLICE FOR
TWIN FALLS POLICE DEPATMENT,
TWIN FALLS POLICE OFFICER
TIMOTHY ARREDONDO, TWIN
FALLS POLICE OFFICER ISAIAH
DAY, and John and Jane Does, I–X,

              Defendants.

Case No. 1:13-CV-00179-EJL-REB

**MEMORANDUM DECISION AND
ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment

(Dkt. 25), Defendants' Motion in Limine (Dkt. 72), and Defendants' Motion to Strike

various documents filed in support of Plaintiff's Opposition to Defendants' Motion for

Summary Judgment (Dkt. 81).

The parties have submitted their briefing on the motions and the matter is now ripe

for the Court's review. Having fully reviewed the record herein, the Court finds that the

facts and legal arguments are adequately presented in the briefs and record.  Accordingly, in the interest of avoiding further delay and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motions shall be decided on the record before this Court without oral argument.

## BACKGROUND

Plaintiff Michael Coleman Savage ("Savage") filed suit against Defendants City of Twin Falls, Twin Falls City Police Department, Brian Pike, Chief of Police for Twin Falls City Police Department, Twin Falls City Police Department Officers Timothy Arrendondo and Isaiah Day, and Jane/John Does I-X (collectively referred to hereinafter as "Defendants").  Brought pursuant to 42 U.S.C. § 1983, Savage alleges Defendants acted in their official capacities to deprive him of the rights protected by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

The incident leading to Savage's suit occurred on May 20, 2011.  At approximately 5:30 p.m. on that date, Twin Falls City Police Officers Timothy Arredondo ("Arredondo") and Isaiah Day ("Day") were on patrol duty when Arredondo was contacted by off-duty Twin Falls Police Officer Joel Woodward ("Woodward").  Woodward advised Arredondo that a suspected drug dealer Kevin Fuller ("Fuller") was driving with a suspended license in the vicinity of the 400 Block of Eastgate Drive in Twin Falls.  Woodward reported that Fuller was driving a maroon Chevy pickup truck.  Arredondo and Day drove to Eastgate Drive to see if Fuller could be located.  When they arrived, Arredondo called Woodward and was advised that Fuller had just exited his car and entered a home located at 457 Eastgate Drive.  It is undisputed that Savage owned

the home located at 457 Eastgate Drive and that Fuller was staying there. Upon arrival, Arredondo and Day observed two unidentified males exit the home and get into a white Dodge Ram truck. The parties vehemently dispute what happened next.

According to Savage, he left his home and got into his white Dodge Ram in order to drive a friend's son, Bradly Bushnell ("Bushnell"), home after having given Bushnell a ride to the grocery store. After taking Bushnell to the store, Savage and Bushnell went to Savage's home to watch television for 20 minutes in order to kill time before Savage had to pick his son up from a field trip at 6 p.m. Savage and Bushnell were leaving Savage's home when Fuller arrived. Savage told Fuller that he was taking Bushnell home and picking up his son, and Fuller went into Savage's home through the garage. As he was leaving his home with Bushnell, Savage noticed Arredondo and Day drive slowly by his home. Savage made eye contact with the officers as they drove by his home. Savage then backed out of his driveway and pulled behind Arredondo and Day in their patrol car. Arredondo pulled over to the side of the road, and Savage pulled around the patrol car in order to continue to Bushnell's home.

Shortly after he pulled around the patrol car, Savage heard a short "whoop" of the patrol car's siren. As he had just left his home and was driving below the 20 mile per hour speed limit, Savage assumed the officers were after someone else and kept driving. A short time later he heard another "whoop" of the siren. At this point Savage realized the officers were attempting to pull him over. In order to avoid traffic, Savage pulled into a dead end street and stopped his truck on the side of the road. Savage was getting his wallet and driver's license out when the patrol car screeched to a stop next to his truck.

Arredondo and Day immediately exited the patrol car with their guns drawn, and approached either side of Savage's vehicle yelling, "You son of a bitch…put your hands up." (Dkt. 67-2, CD filed in support of Plaintiff's Response to Defendants' Motion for Summary Judgment (hereinafter "Dkt. 67-2"), Exhibit 1, Savage Deposition, pp. 77-78.) Savage and Bushnell complied and put their hands up. Arredondo then screamed at Savage to put his hands up higher where Arredondo could see them. Savage again complied.

Arredondo immediately ordered Savage out of the vehicle. Savage complied and got out of the vehicle, and Arredondo holstered his gun. (*Id*., p. 79.) As Arredondo approached him, Savage asked Arredondo why he had been pulled over. Arredondo responded, "Shut the f—up. You're under arrest." (*Id*., p. 80.) Arredondo ordered Savage to put his hands behind his back. Instead of complying, Savage again asked why he had been pulled over. Arredondo responded by telling Savage he was under arrest and ordering Savage to lay on the ground face down with his hands behind his back. (*Id*.) Savage questioned why he was under arrest. Arredondo again responded by ordering Savage to get on the ground face down. (*Id*., pp. 81-82.) At this point, Day came around Savage's truck to assist Arredondo and also ordered Savage to put his hands behind his back. Savage maintains he did not comply because he wanted to know why he had been pulled over and why he was under arrest. Savage felt the situation was abnormal because he hadn't done anything wrong yet was ordered out of his vehicle at gun point, and told he was under arrest, seemingly without provocation. (*Id*.) Every time Savage asked for an explanation, however, he was ordered to shut up and get face down on the ground.

When Day joined Arredondo on the driver side of the truck, both officers grabbed Savage's wrists and attempted to handcuff him. Savage tried to pull his arms away, and admittedly stated, "why did you pull me over, you mother-f—punks?" (*Id.*, p. 89.) Arredondo responded by forcefully shoving Savage into his pickup. Savage grabbed onto the truck and felt "a flurry" of punches to the back of his head and back. (*Id.*, p. 91.) While the officers punched him, Savage testified in his deposition that he continued to hold onto his truck because:

> I want somebody to see what's going on because I just feel like I'm being scooped off the street and kidnapped and whisked away. I'm buying time. I'm not going to go anywhere because I've got a hold of my pickup until, you know, I've got some answers.

(*Id.*)

Savage then felt a blow he believed to be a kick to his left side, knocking the wind out of him and shoving him further into the pickup truck. (*Id.*, p. 93.) After the blow, Arredondo yanked Savage's head to the side by pulling Savage's hair and punched Savage in the right side of his face. (*Id.*, pp. 96-98.) Savage was temporarily knocked unconscious from the force of the blow, and fell to the ground. He landed on his stomach with both arms pinned beneath him and both officers on top of him. When Savage regained consciousness on the ground he stated, "I'm done. I'm done." (*Id.*, p. 99.) Arredondo continued to punch Savage after he was on the ground and had surrendered. Day had one knee in the small of Savage's back and the other in Savage's shoulder when Arredondo again punched Savage in the face. The officers then roughly pulled Savage's arms out from underneath him and handcuffed him. (*Id.*) They left Savage lying face

down on the ground, handcuffed and bleeding profusely, as they called for back-up. It is undisputed that no one administered first aid or offered to help Savage until back-up arrived. At that point Twin Falls Police Sergeant Howe raised Savage off the street into a kneeling position and immediately ordered other officers to clean Savage up and get him medical attention. (*Id*., p. 107.)

Savage was taken to St. Luke's Magic Valley Hospital and treated for concussion, fractured occipital lobe, and for multiple extensive, deep lacerations and contusions. He was then taken to county jail and incarcerated from Friday night until around 2:00 p.m. on Monday. Although Savage was charged with assault and battery on a police officer, and resisting or obstructing arrest, the charges were ultimately dropped.

Defendants have a very different view of the May 20, 2011 stop and arrest. They allege that when they passed 457 Eastgate they observed a vehicle leave the home with two unidentified individuals inside. Arredondo and Day believed Fuller may have been one of the two individuals in the white Dodge Ram. (Dkt. 25-3, ¶ 5.) Noticing the Ram had a severely cracked windshield, Arredondo put on his lights immediately after Savage pulled around him in order to pull the truck over and see if Fuller was inside.[1]

Arredondo claims he immediately put on his overhead lights and siren after Savage passed the patrol car, but Savage refused to stop and proceeded approximately

---

[1] Savage's cracked windshield is against Idaho Code § 49-902 and gave the officers probable cause to pull over Savage's truck.

three blocks into a dead-end street.[2] (*Id.*, ¶ 6.)   Defendants allege Savage then made an abrupt "U-turn" on the dead end street in what Arredondo and Day viewed as an attempt to escape.  (*Id.*, ¶ 7.)  Arredondo then blocked the dead end street with his vehicle, and Savage attempted to go around it before he ultimately pulled over.  Once Savage stopped his truck, the officers exited their vehicle with their guns drawn, and asked Savage to put his hands on the wheel. (*Id.*)

Arredondo maintains Savage stated, "f—ing punk, what the f—did you stop me for?" as soon as he approached Savage's vehicle.  (*Id.*)  Deciding that Savage presented a safety issue because of his attempted escape and aggressive demeanor, Arredondo felt he should detain Savage before explaining why he had been stopped, and ordered Savage out of the vehicle and to place his hands behind his back.  (*Id.*, ¶ 8.)  Arredondo claims Savage responded, "F—you," and stood over Arredondo "with his jaw clenched, fists balled, and sticking his chest out."  (*Id.*)  Defendants do not detail what occurred next, nor provide specifics of the rest of the traffic stop.  Defendants also do not dispute that Arredondo punched Savage in the face with a closed fist both before Savage fell to the ground and after Savage had stated, "I'm done," and was lying prostrate on the ground, with Day on top of him and his arms pinned beneath him.  However, Defendants allege

---

[2] However, it is undisputed that Arredondo and Day violated Twin Falls Police Department Policy by failing to call in and report they were initiating a traffic stop prior to pulling Savage over, failing to obtain information on Savage's license plates prior to the stop, and failing to turn on their digital audio recorders before approaching Savage.

that during the course of the arrest Savage struck Arredondo in the nose, causing it to

bleed, and also struck Day in the lip.  (Dkt. 25-3, ¶ 9.)

## STANDARD OF REVIEW

Summary judgment is appropriate if no genuine issue of material fact exists and

the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  An issue is "material" if it affects the

outcome of the litigation and requires a trial to resolve the parties' differing versions of

the truth.  *S.E.C. v. Seaboard Corp.*, 677 F.2d 1289, 1293 (9th Cir. 1982).  Disputes over

facts that are irrelevant to an element of a claim or defense will not preclude entry of

summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An

issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for

the non-movant.  *Id.*; *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).

The party moving for summary judgment must demonstrate there are no genuine issues

of material fact.  *Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir.

2007).

In responding to a properly supported motion for summary judgment, the non-

movant cannot merely rely upon the pleadings, but must present specific and supported

material facts, of significant probative value, to preclude summary judgment.  *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In determining

whether a genuine issue of material fact exists, the court views the evidence and draws

inferences in the light most favorable to the non-movant.  *Anderson*, 477 U.S. at 255.

Because factual disputes are to be resolved at trial, the court does not resolve conflicting

evidence with respect to disputed material fact, nor does it make credibility determinations, in ruling on summary judgment motions. *Id.*

## ANALYSIS

Congress has created a cause of action against individuals who, while acting under color of law, violate the constitutional rights of private citizens. Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivations of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured[.]

42 U.S.C. § 1983.

"Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (citing *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 978 (9th Cir. 2004)). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *Id.* (citation omitted).

To establish a prima facie case under 42 U.S.C. § 1983, a Plaintiff "must adduce proof of two elements: (1) the action occurred 'under color of law' and (2) the action resulted in a deprivation of a constitutional right or a federal statutory right." *Souders v. Lucero*, 196 F.3d 1040, 1043 (9th Cir.1999) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Here it is undisputed that Arredondo and Day were acting under "color of law" when they stopped and arrested Savage. The question is thus whether Savage was

deprived of constitutional rights during the course of his arrest. Savage alleges he was deprived of the rights protected under the Fourth, Eighth and Fourteenth Amendments during his arrest.

The Supreme Court has determined where, as here, an excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which "guarantees citizens the right 'to be secure in their persons…against unreasonable seizures' of the person."[3] *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). The *Graham* Court further held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process approach.'" *Id*. at 395 (emphasis in original).

## I.     Excessive Force

Determining whether the force used in the course of an arrest is "reasonable" under the Fourth Amendment requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

---

[3] In *Graham*, the Supreme Court further explained that the Fourteenth Amendment protects a pretrial detainee from the use of excessive force that amounts to punishment, and, after conviction, the Eighth Amendment "serves as the primary source of substantive protection…in cases…where the deliberate use of force is challenged as excessive and unjustified.'" *Id*., n. 10 (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).

governmental interests at stake." *Id*. at 396 (internal quotations and citation omitted).

Fourth Amendment jurisprudence has long held that the "right to make an arrest or

investigatory stop necessarily carries with it the right to use some degree of physical

coercion or threat thereof to effect it." *Id*. (citing *Terry v. Ohio*, 392 U.S. 1, 22-27

(1983)). Because police officers "are often forced to make split-second judgments," not

"every push or shove, even if it may later seem unnecessary in the peace of a judge's

chambers," violates the Fourth Amendment. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir.

2002) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). However, "even

where some force is justified, the amount used may be excessive." *Id*. (citing *P.B. v.

Koch*, 96 F.3d 1298, 1303-04 (9th Cir. 1996)). The question in all excessive force cases

is whether the use of force was "objectively reasonable in light of the facts and

circumstances confronting" the arresting officers. *Graham*, 490 U.S. at 397.

     The determination of whether a specific instance of force was objectively

reasonable requires careful attention to the facts of a particular case. *Id*. As such, the

reasonableness of force in a particular case is generally a question of fact for the jury.

*Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir. 1997) ("We have held

repeatedly that the reasonableness of force used is ordinarily a question of fact for the

jury.") Because excessive force cases "almost always turn on a jury's credibility

determinations," the issue of excessive force should rarely be decided on summary

judgment. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005); *see also*

*Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1205-06 (9th Cir. 2000),

(*judgment vacated and remanded on other grounds*, 534 U.S. 801 (2001) (determination

of whether the force used to effect an arrest was reasonable under the Fourth Amendment is inherently fact-specific and should be taken from the jury only in rare cases); *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994) ("[W]hether a particular use of force was reasonable is rarely determinable as a matter of law.").

### A. Nature and Quality of Intrusion

Under the *Graham* balancing test, the Court first must assess the quantum of force used to arrest Savage by considering "the type and amount of force inflicted." *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (internal quotation and citation omitted). There is no question that the degree of intrusion here was severe. Viewing the facts in the light most favorable to Savage, as the Court must for purposes of summary judgment, Savage was ordered out of his vehicle by two officers with guns pointed at him. Savage was unaware of why he had been pulled over or what he had done to warrant being put under arrest, and Arredondo and Day refused to answer any questions regarding their justification. When Savage did not immediately comply with the officers' commands to get on the ground, face down, with his hands behind his back, Savage was repeatedly kicked, pushed, and punched until he lay prone on the ground with his arms pinned beneath him and Day on top of him. Savage was knocked unconscious by the initial punches to his face, and Arredondo continued to punch him in the face even after Savage surrendered, stating, "I'm done," and was lying on the ground helpless. Arredondo and Day also left Savage lying face down on the ground, bleeding profusely and handcuffed, until backup arrived.

The use of force was also obviously enough to cause grave physical injury. It knocked Savage unconscious and broke his eye socket. Savage was treated for multiple extensive, deep laceration and contusions, and comminuted blowout fractures involving the floor and medial walls of his eye socket. (Dkt. 67-1, ¶ 16.) Savage suffered severe pain, swelling, bleeding, double, and blurred vision as a result of the blows to his eye. (*Id*.) He also suffered associated herniation of fat into the right root of the right paranasal sinuses and blood in the right maxillary sinus. (*Id*.) Savage's eye sight has been permanently damaged as a result of the force, and he must wear a prism in his eye glasses because of his injuries. (*Id*., ¶ 17.)

Arredondo confirmed in his deposition that he hit Savage in his face "as hard as [he] could," and that another option would have been to just go after Savage's left arm, as Day had a hold of Savage's right arm when Arredondo first punched Savage in the face. (Dkt. 67-2, Exhibit 2, Arredondo Deposition, p. 84.) Arredondo also admitted that he hit Savage again, on the same side of his face, one or two times, after Savage was lying prostrate on the ground with Day on top of him. (*Id*., p. 88.) Twin Falls Police Sergeant Daniel McAtee testified in his deposition that he was concerned about Arredondo's use of force because officers are never trained to use closed fist strikes to the face as a pain compliance technique. (Dkt. 67-2, Exhibit 6, McAtee Deposition, p. 110.) The Court concludes both the risk of harm and the actual harm experienced by Savage were significant and, as such, must be justified by substantial government interests. *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012).

*B. Governmental Interests*

To evaluate the need for the government's use of force against Savage, the Court must consider a number of factors, including the severity of the crime at issue, whether Savage posed an immediate threat to the safety of the officers or others, and whether he actively resisted arrest or attempted to evade arrest by flight. *Graham*, 490 U.S. at 396. "Where these interests do not support a need for force, '*any* force used is constitutionally unreasonable.'" *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (quoting *Lolli v. Cnty. of Orange*, 351 F.3d 410, 417 (9th Cir. 2003)) (emphasis in original).

The first *Graham* factor, the severity of the crime at issue, weighs in favor of Savage and against the use of force employed by the officers. The only crime Savage undisputedly committed was a mere traffic infraction—having a cracked windshield—punishable by a fine. "Traffic violations generally will not support the use of a significant level of force." *Bryan v. MacPherson*, 630 F.3d 805, 828 (9th Cir. 2010) (citing *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) ("Deville was stopped for a minor traffic violation…making the need for force substantially lower than if she had been suspected of a serious crime.").

Although Defendants claim the use of force was justified by Savage's attempt to elude Arredondo and Day and aggressive behavior once he was stopped, such facts are disputed and cannot be viewed in Defendants' favor upon summary judgment. Moreover, several of Defendants' claims regarding Savage's purported escape attempt are undermined by the evidence, such as the testimony of Sergeant McAtee, who stated in his deposition that there was no evidence Savage attempted to speed up or evade being

stopped.  (Dkt. 67-2, Exhibit 6, McAtee Deposition, pp. 66-67, 79, 81; *see also* Dkt. 67-2, Exhibit 4, Interview with Arredondo following Savage's arrest. pp. 6-7.)  Further, even if, accepting Defendants' version of the facts, Savage immediately stated, "f—ing punks, why did you pull me over?," as soon as Arredondo and Day approached him with their guns drawn, swearing at a police officer is not a crime, and a suspect's use of foul language does not justify an excessive use of force in response.  *See Liberal v. Estrada*, 632 F.3d 1064, 1078 (9th Cir. 2011) ("there is no mistake of law which immunizes an officer for applying force to a suspect for 'smarting off' nor to one detained without probable cause or reasonable suspicion"); *Smith*, 394 F.3d at 702 (finding suspect did not pose threat to officers' safety despite suspect's use of expletives directed at officers).

The next *Graham* factor, or whether Savage posed an immediate threat to the safety of the officers or others also weighs in favor of Savage.  Under Savage's account of the stop, there was no reason to believe his actions posed a threat to the officers, himself or to Bushnell.  Savage disputes that he attempted to evade arrest, and contends that he pulled over immediately once he realized Arredondo and Day were signaling him to do so.  Even under Defendants' version of the facts, it is admitted that Savage pulled over within two blocks, or 580 feet, from the point Arredondo put on his lights.  (*See, e.g.*, Dkt. 67-2, Exhibit 6A, Exhibit 6B, p. 3.)  It is also undisputed that Savage had no guns or weapons, and that he complied with Arredondo's commands to put his hands up and get out of the car. Although Defendants maintain Savage posed an immediate threat to the safety of the officers and other because "he immediately became belligerent and proceeded to fight with police officers," such facts are disputed.  (Dkt. 25-1, p. 9.)

Moreover, there must be objective factors supporting an officer's fear for their safety or the safety of others. *Deorle*, 272 F.3d at 1281. Evidence submitted by Savage in opposition to summary judgment illustrates that objective factors did not support Arredondo and Day's immediate fear for their safety. Specifically, Twin Falls Police Department Sergeant Howe noted in his excessive force investigation report that there were "multiple other options available to both officers" to avoid any danger they believed Savage imposed. (Dkt. 82-5, p. 7.) Howe explained:

> The vehicle had stopped and the Officers were in a position of advantage. Resources were limited but they were limited by the Officers on scene because there was no assistance en route. There were no other Officers on the way because the traffic stop had not been called out by either officer and the failure to yield was not transmitted over the radio. Officers could have conducted a felony stop with the concerns from the failure to yield. Officers could have allowed Mr. Savage to remain in the standing position outside the vehicle or with his hands on the wheel until another Officer was called or arrived. Nothing in this stop necessitated the immediate handcuffing of Mr. Savage. Officers could have gauged the level of compliance with Mr. Savage prior to placing in handcuffs for an equipment violation.[4]

*Id*.

It is also undisputed that Savage resisted Arredondo and Day only after he was ordered to lie face down on the ground with his hands behind his back. The extent of Savage's resistance necessarily implicates the third *Graham* factor, or whether Savage was actively resisting or attempting to evade arrest by flight. As noted, whether Savage

---

[4] The Ninth Circuit has held whether other tactics were available to effect an arrest is also relevant to the excessive force inquiry. *Headwaters Forest Def*., 240 F.3d at 1204 (quoting *Chew*, 27 F.3d at 1443); *Smith*, 394 F.3d at 701. Sergeant Howe's report outlining multiple other tactics Arredondo and Day could have used to affect the arrest buttresses Savage's claim of excessive force and presents another factor weighing in Savage's favor under the *Graham* balancing test.

was attempting to evade arrest is clearly disputed, and even undermined by the testimony of Twin Falls Police Department Sergeants McAtee and Howe. Both parties also agree that Arredondo engaged in very little, if any, negotiation with Savage, and instead immediately resorted to ordering Savage out of his vehicle and attempting to force his hands behind his back. However, Savage admits that once Arredondo and Day grabbed his wrists, he resisted by pulling his arms away and grabbing on to the bed of his truck. Savage also admits that, once the officers grabbed his wrists, he stated, "why did you pull me over, you mother-f—punks?" (Dkt. 67-2, Exhibit 1, Savage Deposition, p. 89.)

The level of force "an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Bryan*, 630 F.3d at 830. In *Smith*, 394 F.3d at 703, the Ninth Circuit addressed the nature of resistance exhibited by a plaintiff "who continually ignored officers' requests to remove his hands from his pajamas and place them on his head," who re-entered his home after officers ordered him not to, and who "physically resisted" for a brief time. *Id*. at 703. Until both of his arms were handcuffed, the individual in *Smith* also "continued to shield one arm from the officers and their dog and to shout expletives at the officers[.]" *Id*. at 702. The court determined such resistance was not "particularly bellicose" and concluded that the third *Graham* factor offered little support for the use of significant force against the individual. *Id*. at 703. Under *Smith*, Savage's limited resistance in pulling his arms away and holding on to the side of his truck also offers little support for the significant use of force against

him.[5] *See also Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013) (failure to fully or immediately comply with police orders neither rises to the level of active resistance nor justifies application of non-trivial use of force).

In *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 952 (9th Cir. 2000), plaintiff admitted to resisting arrest and "getting into a scuffle" with defendant police officer. However, LaLonde testified that his resistance ceased once defendant officer sprayed him with pepper spray. At that point, another officer handcuffed LaLonde while forcefully putting his knees in plaintiff's back, causing LaLonde significant pain. *Id.* The officers then let LaLonde sit on his couch while they awaited backup and searched his home, but left LaLonde in handcuffs and did nothing to alleviate the pepper spray from burning his eyes. After twenty to thirty minutes had passed, two other officers arrived and almost immediately got a wet dish towel to wipe the pepper spray out of LaLonde's eyes. *Id.*

The *LaLonde* court held that a reasonable jury could determine both the injury to LaLonde's back and the failure to alleviate the effects of the pepper spray constituted

---

[5] Defendants maintain that Savage's resistance was much more extreme, and that Savage hit Arredondo in the nose and Day in the lip during the course of his struggle with the officers. This claim is undercut by both Savage's deposition testimony and some of the evidence. (*See, e.g.*, Dkt. 61-2, Exhibit 1, Savage Deposition, pp. 87-101; Exhibits 7B and 7C, pictures of Arredondo following Savage's arrest; *see also* Dkt. 67, p. 11.) Whether Savage actually struck the officers, and whether such resistance would justify the use of force the officers responded with, are questions for the jury. *Reed v. Hoy*, 909 F.2d 324, 330 (9th Cir. 1989) (rejecting defendant officer's contention that his actions were reasonable as a matter of law in light of plaintiff's active resistance, use of weapons, and failure to heed warnings, and holding instead on the record before it a rational jury could find for either party).

excessive force, despite LaLonde's admitted resistance.[6]  As to the former, the court noted "if the extent of the injury to LaLonde's back is serious enough, a jury could conclude that [defendant officer] used force in excess of what was reasonable, even if LaLonde had been resisting at the time." *Id*. at 959.  With respect to the unnecessary and prolonged exposure to pepper spray, the court held a reasonable jury could conclude that deliberately allowing the plaintiff to suffer the consequences of pepper spray after he had fully surrendered and was under police control constituted excessive force. *Id*. at 961, n. 18.

In this case, the Court finds a reasonable jury could conclude Arredondo's use of closed fist strikes to Savage's face before he was on the ground constituted excessive force, despite Savage's resistance.  Similarly, a reasonable jury could find Arredondo's subsequent punches to Savage's face after Savage was on the ground, had surrendered, and was subdued by Day, constituted excessive force.  Finally, a reasonable jury could also conclude leaving Savage face down on the street, bleeding profusely and handcuffed until backup arrived constituted excessive force.  It is thus impossible to weigh the third *Graham* factor in favor of either party, as both the extent of Savage's resistance, and whether such resistance justified Arredondo and Day's use of force, are disputed issues of material fact which must be submitted to the jury.

---

[6] Plaintiff in *LaLonde* also alleged that defendant officers handcuffed him so tightly his hands went numb and refused to loosen the cuffs when he complained.  Noting a number of Ninth Circuit cases have held that tight handcuffing can constitute excessive force, the court held this aspect of the case should also have gone to the jury. *Id*. at 960 (citations omitted).

*C. Weighing the Conflicting Interests*

Here, given all the circumstances, including the significant level of force used, the minor nature of Savage's crime, Savage's compliance with prior commands of the officers, the lack of objective factors to support Arredondo and Day's fear for their safety, the fact that Savage was unarmed, the availability of alternatives which could have de-escalated the situation, and the disputed facts regarding the extent of Savage's resistance, the Court finds the *Graham* balancing test weighs heavily in Savage's favor. As such, it is impossible to hold that the force used in this case was reasonable as a matter of law. Summary judgment for Defendants on Savage's excessive force claim must accordingly be denied.

## II. Qualified Immunity

Arredondo and Day contend they are entitled to qualified immunity on Savage's excessive force claims because "it would not have been clear to any reasonable police officer on May 20, 2011, that the use of force in the situation confronted by Officers Arredondo and Day was constitutionally permissible." (Dkt. 25-1, p. 4) The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Green*, 751 F.3d at 1051 (internal quotations and citation omitted). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. –, 131 S.Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341

(1986)).  The Ninth Circuit has found that an officer will be denied qualified immunity in

a § 1983 action only if:

> (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation.

*Green*, 751 F.3d at 1051-1052 (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123

(9th Cir. 2011)).

　　　As the preceding analysis makes clear, whether Arredondo and Day violated a

constitutional right remains an open question for the jury, and Defendants cannot be

granted summary judgment on this basis.  Instead, the Court must proceed to the second

step of the qualified immunity inquiry, or whether "the right at issue was clearly

established at the time of the incident such that a reasonable officer would have

understood [his] conduct to be unlawful."  *Id.*; *see also Gravelet-Blondin*, 728 F.3d 1086,

1092 (9th Cir. 2013) ("Having concluded that Sgt. Shelton may indeed have used

excessive force in violation of the Fourth Amendment, we now consider whether the right

to be free from such force was clearly established at the time of the incident.").

　　　For a constitutional right to be "clearly established," its "contours must be

sufficiently clear that a reasonable official would understand that what he is doing

violates that right."  *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  The

Supreme Court has held "officials can still be on notice that their conduct violates

established law even in novel factual circumstances."  *Hope*, 536 U.S. at 741.  Courts

must be "particularly mindful of this principal in the context of Fourth Amendment cases,

where the constitutional standard—reasonableness—is always a very fact specific inquiry." *Gravelet-Blondin*, 728 F.3d at 1093. However, while there need not be a "case directly on point," existing precedent "must have placed the statutory or constitutional question beyond debate." *Al-Kidd*, 131 S.Ct. at 2074.

The determination of whether the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood his conduct to be unlawful thus requires two separate inquiries: (1) whether the law governing the conduct at issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law. *Green*, 751 F.3d at 1052 (citing *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)).

Here, the first element is established as a matter of law. The right to be free from the application of non-trivial force for engaging in passive resistance has been clearly established for nearly fifteen years.[7] *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (collecting cases). The Court must next determine whether an officer, given the specific facts at issue, could have reasonably believed at the time that the force actually used was lawful under the circumstances. *Torres*, 648 F.3d at 1127. This requires consideration of what Arredondo and Day knew at the time and whether it was sufficient to support a reasonable officer's belief that his actions were lawful. *Green*, 751 F.3d at 1052. There are disputed material facts here that prevent the Court from making such a

---

[7] Of course, whether Savage's resistance can be considered "passive" is a disputed issue for the jury. However, taking the facts in the light most favorable to Savage, the Court finds a reasonable jury could determine Savage's resistance was passive.

finding on summary judgment. For example, it is disputed whether Savage attempted to evade arrest, and it is also disputed whether Savage resisted simply by holding onto his truck or whether he swung at police officers. These are both material facts that preclude a determination as to qualified immunity at the summary judgment stage. *Id*.; *see also, Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991) (summary judgment finding officers entitled to qualified immunity is appropriate only if the officers are entitled to judgment on the basis of the facts most favorable to plaintiff).

Taking the facts in the light most favorable to Savage, a jury could reasonably find that the degree of force used by the officers in this case was sufficiently egregious to warrant denial of qualified immunity because a reasonable officer would have known that the degree of force was unconstitutionally excessive under the circumstances. *See, e.g*., *Deville*, 567 F.3d at 169 (finding defendants were not entitled to qualified immunity on excessive force claim because plaintiff's alleged resistance did not justify officer's use of force); *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (cases dating back to 2001 have established that a "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force."); *Deorle*, 272 F. 3d at 1285 (shooting a beanbag projectile at a suicidal, irrational individual who was walking directly towards an officer was excessive, and denying qualified immunity because every police officer should have known that it was objectively unreasonable to use such force under the circumstances); *Liberal*, 626 F.3d 1079 (denying officers qualified immunity on excessive force claim where the use of force against plaintiff occurred after he complied with officer's request for his driver's

license and registration, where plaintiff had not committed a crime, and because plaintiff did not pose an immediate threat to anyone's safety and complied with officer's request to step out of his car). When viewing the facts in the light most favorable to Savage, the Court cannot make a determination as a matter of law that Arredondo and Day "could have reasonably believed at the time that the force actually used was lawful under the circumstances." *Torres*, 648 F.3d at 1127. Instead, this question must go before the jury.

### III. Municipal Liability and Negligent Supervision

Defendants maintain the city of Twin Falls and Chief Pike are immune from claims based on *respondeat superior*. (Dkt. 25-1, p. 2.) While local governments may be sued under § 1983, they cannot be held vicariously liable for their employees' constitutional violations. *Monell v. New Yotk City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Instead, a municipality is subject to liability under § 1983 only if the city is "alleged to have caused a constitutional tort through 'a policy, statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (quoting *Monell*, 436 U.S. at 690). Under the *Monell* doctrine, Savage may recover from the city only if his injury was inflicted pursuant to city policy, regulation, custom or usage. *Monell*, 436 U.S. at 691.

To recover against the city under *Monell*, city policy "need only cause the constitutional violation; it need not be unconstitutional per se." *Jackson v. Gates*, 975 F.2d 648, 654 (9th Cir. 1992). City policy "causes" an injury "where it is the moving force" behind the constitutional violation, or where the city itself is the wrongdoer. *Monell*, 436 U.S. at 694.

Defendants argue the City of Twin Falls has no formal policy or custom allowing for the use of excessive force during a traffic stop, and that Twin Falls Police Department Policy provides that in situations where a police officer is confronted with a "fleeing or resisting person," he is authorized to use "force other than deadly force." (Dkt. 25-1, p. 3.) Under Twin Falls Police Department Policy, officers are "authorized to use whatever force is reasonable and necessary to affect an arrest." (*Id*.) Under Defendants' articulation of city policy, Twin Falls Police Department officers are authorized to use any form of non-deadly force against all fleeing or resisting suspects, regardless of whether their resistance is active or passive, whether they are armed or unarmed, violent or non-violent. Thus, under Defendants' view of city policy a police officer could, as alleged here, use a closed fist to strike a non-violent, passively resistant suspect in the face, as hard as possible, until the suspect was knocked unconscious and ultimately handcuffed. When construing it as Defendants suggest, city policy could doubtless be found to be the "moving force" behind Savage's injury.

Defendants would likely argue the latter conclusion is unwarranted because officers may use only force that is "reasonable" and "necessary" to make an arrest, and the aforementioned example would constitute unreasonable and unnecessary force. The problem with Defendants' argument is that it places the reasonableness determination solely within the discretion of the arresting officers. However, a city cannot "escape liability for the consequences of established and ongoing departmental policy regarding the use of force simply by permitting such basic policy decisions to be made by lower level officials who are not ordinarily considered policymakers." *Chew v. Gates*, 27 F.3d

at 1445.  If the city of Twin Falls in fact permitted departmental policy regarding the use of closed fist strikes to the face to be designed and implemented at lower levels of the department, "a jury could, and should…find that the policy constituted an established municipal 'custom or usage' regarding the use of [such strikes] for which the city is responsible.  *Id.* (quoting *City of St. Louis*, 485 U.S. at 127 (1988)).

There is evidence in the record to support a finding that city policy delegated the appropriate use of force determination to the arresting officers.  Specifically, Arredondo testified in his deposition that he punched Savage in the face because he was trained to use closed fist strikes to the face as a method of pain compliance.  (Dkt. 67-2, Exhibit 2, Arredondo Deposition, pp. 84-85.)  Arredondo confirmed he had used such technique in a "few" past cases.  (*Id.*, p. 85.)  When questioned if it was department policy to hit someone in the face just to get them to comply, Day testified "[w]e're trained to take the level of force we're met with plus one."  (Dkt. 67-2, Exhibit 5, Day Deposition, p. 63.) However, Day clarified that it was not authorized under Department Policy to hit someone in the face simply because they resist arrest.  (*Id.*, p. 64.)  Instead, under Department Policy, Day claimed officers could go up one level of force from the suspect's resistance.  Day further explained:

> So if somebody's punching me, then I can punch them or plus one from that, which would go to an impact weapon or a less lethal.  But in this circumstance I never threw a punch….I didn't need to from where I was at.  I was just trying to maintain control of one arm so I could get him off the truck so we could get his arms behind his back.

(*Id.* p. 65.)

By contrast, Sergeant McAtee stated in his deposition that, in the 17-18 years he had been with the Twin Falls Police Department at the time of Savage's arrest, he had never been trained to "double my fist and use strikes to the face as a compliance measure." (Dkt. 67-2, Exhibit 6, McAtee Deposition, p. 110.) Sergeant McAtee further explained:

> [Arredondo] made a statement about [how] he used a strike to the, as I recall, to the face as a pain compliance movement. That has never been taught to us. Realistically the last thing you want to do as an officer is use any kind of strike anywhere as a pain compliance. There are other methods.[8]

(*Id.* p. 111.)

That defense witnesses provide three conflicting views of purported Department Policy with respect to the use of closed fist strikes to the face as a method of pain compliance suggests the city had no policy regarding the proper use of such force, or, at best, a policy of vesting complete discretion regarding the use of such force in individual police officers. Indeed, Arredondo testified that he had used such force in "a few" past cases but had not been disciplined, and Arredondo was also not disciplined for using such force against Savage. The city may thus alternatively be held liable for ratifying Arredondo's unconstitutional conduct. "[A] local government may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Gravelet-Blondin*, 728 F.3d at

---

[8] Defendants make much of Sergeant McAtee's subsequent clarification that "once the fight is on, all rules are off." (Dkt. 82, pp. 3-5.) Both in making this distinction, and throughout their Motion for Summary Judgment, Defendants fail to appreciate that whether the "fight" with Savage was in fact "on" is disputed.

1097 (quoting *Cloutheir v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010);

*see also City of St. Louis*, 485 U.S. at 127 ("If [ ] authorized policymakers approve a

subordinate's decision and the basis for it, their ratification would be chargeable to the

municipality because their decision is final.").

Moreover, evidence submitted by Savage regarding the police department's

review of excessive force cases suggests the city and Chief of Police failed to properly

train and supervise its officers in conducting use of force investigations.  Specifically,

Sergeant Howe, who was responsible for investigating the use of force in this case, and

who was a member of the Police Department's Use of Force Board at the time of the

incident with Savage, testified in his deposition that there is no requirement for

supervisors to submit reports to the Use of Force Board, and confirmed that minutes are

not taken and there is no audio recording of the Use of Force Board's deliberations.  (Dkt.

67-2, Exhibit 7, Howe Deposition, pp. 13-14.)  Howe also noted that the Use of Force

Board does not hear testimony from any witnesses or officers, and considers only the use

of force report in issuing its decision.  (*Id.*, p. 15.)  According to Howe, the Use of Force

Board does not review the personnel file of the officer before making its decision, and

does not recommend any sanctions or changes if it determines an officer has not

complied with policy.  (*Id.*, pp. 16-17, 19.)  Howe confirmed there is no requirement that

a supervisor interview the officer involved in an alleged incident of excessive force, and

Howe could not remember if he had interviewed Arredondo and Day in preparation of the

use of force report involving Savage.  (*Id.*, pp. 23-24.)  Finally, Howe confirmed he had

no personal knowledge regarding the use of force against Savage, but confirmed that he

determined Arredondo and Day's use of force was in compliance with policy. (*Id.*, p. 24.)

Under such circumstances, a reasonable jury could find that Savage's injury was caused by Twin Falls Police Department Policy that failed to adequately train officers with respect to use of force against resisting suspects, and failed to adequately train its officers on the appropriate investigation of use of force. *Chew*, 27 F. 3d at 1445. A failure to provide any guidance on the use of force appropriate in circumstances of fleeing or resisting suspects, or to implement rules or regulations regarding the constitutional limits of that use, evidences the city in this case was potentially "deliberately indifferent" to constitutional rights. *Id.* In light of the testimony of Arredondo, Day, McAtee, and Howe regarding departmental policy, or lack thereof, with respect to use of force on fleeing or resisting suspects, and investigation of the use of such force, there is a genuine dispute of material fact with respect to Savage's claims against the city and Chief Pike for violation of the Fourth Amendment and negligent supervision and training. Summary judgment must accordingly be denied with respect to such claims.

## IV.    State Law Claims

Savage also alleges Defendants are liable for civil assault and battery, false imprisonment, and false arrest. Defendants respond that they are immune from liability for such claims under I.C. §6-904.

The Idaho Tort Claims Act ("ITCA"), specifically I.C. § 6-903, subjects government entities to liability for negligent or wrongful acts committed by the entity or

its employees where a private person would also be liable. *Sprague v. City of Burley*, 710 P.2d 566, 579 (Idaho 1985). However, Idaho Code § 6-903(1) expressly exempts certain causes of action from the general rule that the governmental entity is subject to liability. In this respect, the ITCA reads:

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which…[a]rises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contractual rights.

I.C. § 6-904(3).

Under the ITCA, the city of Twin Falls and Police Chief Pike are immune from claims, such as those here, arising from assault, battery, false imprisonment and false arrest. *White v. Univ. of Idaho*, 797 P.2d 108, 108-09 (Idaho 1990); *see also Curtis v. City of Gooding*, 844 F.Supp.2d 1101, 1107-08 (D. Idaho 2011) ("The plain language of [Idaho Code § 6-904(3)] exempts governmental entities from liability for the torts it lists, whether or not there has been an allegation of malice or criminal intent.") (quoting *Hoffer v. City of Boise*, 257 P.3d 1226, 1228 (Idaho 2011)). Summary judgment must be granted with respect to Savage's intentional tort claims against the City of Twin Falls and Police Chief Pike.

Arredondo and Day are also immune from claims arising out of intentional torts absent evidence that they acted with malice or criminal intent. I.C. § 6-904(3); *see also Curtis*, 844 F.Supp. 2d at 1108 (an employee is immune from suit for those intentional torts listed in I.C. § 6-904(3) if there is no allegation of malice and/or criminal intent).

Savage failed to respond to Defendants' argument regarding the ITCA, and failed to present any evidence to establish Arredondo and Day acted with malice or criminal intent, in his response to Defendants' Motion for Summary Judgment. To survive summary judgment with respect to his intentional tort claims, Savage "cannot rest on the pleadings but must show some evidence from which the court could reasonably infer the critical elements of [his] claim." *Miller v. Idaho State Patrol*, 252 P.3d 1274, 1288 (Idaho 2011) (citation omitted). Because Savage has failed to create a genuine issue of fact for trial that Arredondo and Day acted with "malice" or "criminal intent," summary judgment must also be granted for Arredondo and Day with respect to Savage's intentional tort claims.

Savage also alleges Defendants are liable for intentional and negligent infliction of emotional distress. Defendants argue Savage has not established the elements of either intentional or negligent infliction of emotional distress. (Dkt. 25-1, pp. 14-19.) In Idaho, "an action for intentional infliction of emotional distress will lie only where there is extreme and outrageous conduct coupled with severe emotional distress." *Walston v. Monumental Life Ins. Co*., 923 P.2d 456, 464 (Idaho 1996). To support a claim for negligent infliction of emotional distress, a plaintiff must establish the elements of common law negligence, as well as provide evidence of some physical manifestation of injury in order to state a claim. *Black Canyon Racquetball Club, Inc*., 804 P.2d 900, 904 (Idaho 1991). Savage failed to respond in any substantive way to Defendants' arguments regarding his claims of intentional and negligent infliction of emotional distress, and failed to provide any evidence of either severe emotional distress or physical

manifestation of injury in his opposition to Defendants' motion for summary judgment. Further, Savage did not hire an expert witness to testify on this point, and the deadline for disclosure of expert witnesses has passed. Moreover, Savage confirmed in his deposition that he has never seen any kind of mental health provider, that he has not received any medication for any emotional problems, and that he never reported any emotional problems to any healthcare provider following his May 20, 2011 arrest. (Dkt. 67-2, Exhibit 1, Savage Deposition, p. 66.) Because Savage has not offered any evidence to substantiate intentional and negligent infliction of emotional distress, summary judgment must be granted with respect to such claims.

## V.    Other Motions

### A.  *Defendants' Motion in Limine*

Defendants filed a Motion in Limine (Dkt. 72) to preclude Savage from offering any expert witness testimony at trial or in opposition to summary judgment, as Savage purportedly failed to provide an adequate expert disclosure by the deadline required by the Court's Scheduling Order (Dkt. 62) and Federal Rule of Civil Procedure 26(a)(4)(B). Specifically, Defendants complain that although Savage identified his expert witness, Edward A. Leach ("Mr. Leach"), and provided Mr. Leach's resume by the October 17, 2014 Scheduling Order deadline, Defendants did not receive Mr. Leach's final completed report, which included Mr. Leach's anticipated opinions, rate sheet, and list of prior cases in which he had given deposition and trial testimony, by the October 17, 2014 deadline. (Dkt. 72, p. 3.)

Defendants filed the Motion in Limine to exclude Savage's expert on October 23, 2014. In response, Savage's attorney maintains Mr. Leach's complete report was not provided by the October 17 deadline solely due to clerical error related to his change in offices,[9] as counsel believed the complete report had been faxed along with Mr. Leach's identification and resume, but learned, for the first time upon reviewing Defendants' Motion in Limine, that the complete report had not been produced. (Dkt. 74, p. 2.) However, Savage's counsel immediately sent Mr. Leach's complete report to Defendants on October 31, 2014 upon learning of the omission. (Dkt. 74-1, ¶ 6.) Further, Mr. Leach's initial report, which included his opinions, rate of compensation and list of prior testimony, was also provided to Defendants much earlier, on April 24, 2014, in support of Savage's Motion to Modify the Scheduling Order (Dkt. 43-2).

Under Federal Rule of Civil Procedure 37(c)(1), if a party "fails to provide information or identify a witness as required by Rule 26(a) or (e) [which includes disclosure of expert witness reports], the party is not allowed to use that information or witness to supply evidence…at a trial, unless the failure was substantially justified or is harmless." Thus, non-disclosed information may be admissible if the failure to disclose was either substantially justified or harmless. *Galentine v. Holland America Line-Westours, Inc.*, 333 F.Supp.2d 991, 993 (W.D.Wash. 2004) (citing *Yeti by Molly, Ltd. v.*

---

[9] Counsel's change in offices also provided the basis for Savage's Motion for Extension of Time to Respond to Defendants' Motion for Summary Judgment. (Dkt. 64).

*Decker Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); *Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia*, 248 F.3d 29, 33 (1st Cir. 2001)).

For the reasons explained by Judge Bush in his Order Granting Savage's Motion for Extension of Time to Respond to Defendants' Motion for Summary Judgment, Savage's delay in disclosing Mr. Leach's supplemental report due to counsel's change in offices can be considered substantially justified. (Dkt. 78, pp. 16-20.) The Ninth Circuit has analyzed whether failure to disclose can be considered harmless by looking at whether the failure to disclose prejudiced the opposing party. *Galentine*, 333 F.Supp.2d at 993.

While Savage's expert disclosure did not fully comply with Rule 26 or the Court's Scheduling Order, the Court does not find that Defendants have suffered harm under the circumstances here. While past the deadline, Savage's supplemental disclosure was provided fourteen days later. Further, Defendants had notice of Mr. Leach's identity, conclusions and qualifications more than six months before the Scheduling Order deadline. Defendants were accordingly aware of Mr. Leach's opinion. Even if they wished to depose Mr. Leach, it is unlikely that Defendants would have done so within fourteen days. In fact, the Scheduling Order provided Defendants had until February 13, 2015, more than three months after the supplemental report was disclosed on October 31, 2014, to depose Savage's expert. (Dkt. 62.) Yet Defendants ultimately chose not to depose Mr. Leach. Further, when Savage's counsel provided Defendants with the supplemental report on October 31, 2014, with an explanation regarding the inadvertent failure to do so by October 17, 2014, Savage's counsel also offered to grant Defendants a

corresponding extension for disclosure of Defendants' expert report.  (Dkt. 74-2.)

Defendants chose to instead proceed with seeking exclusion of Mr. Leach's testimony.

(*Id*.)  In light of the foregoing, Defendants have not substantiated any specific prejudice

they would suffer as a result of allowing Mr. Leach to testify despite the belated

disclosure of his supplemental report.

In addition to the prejudice factor, a court is to look to the public policy favoring

disposition of cased on their merits, the availability of less drastic sanctions, the court's

need to manage its docket, and the public's interest in expeditious resolution of litigation,

when deciding whether to exclude belatedly disclosed or non-disclosed information.

*Wendt v. Host Int'l, Inc*., 125 F.3d 806, 814 (9th Cir. 1997).  Public policy favors

disposition of cases on their merits.  Federal Rule of Civil Procedure 1 provides: "These

rules…shall be construed and administered to secure the *just*, speedy, and inexpensive

determination of every action."  (emphasis added).  Excluding Mr. Leach's testimony,

which would inevitably undermine and potentially foreclose Savage from proving his

case at trial, would negate the public policy found in Rule 1.

Although the public and the parties have an interest in expeditious resolution of

litigation, and though the Court is aware this case has been plagued by delay and

extension requests primarily caused by Savage's current and former counsel, the Court

finds the fourteen day delay in disclosing Mr. Leach's supplemental report did not

postpone this case, nor frustrate the Court's ability to manage its docket. At the time of

October 17, 2014 disclosure deadline, trial had not been set and Defendants' Motion for

Summary Judgment was not ripe.  Further, Defendants chose not to depose Mr. Leach

even though they had more than three months after Savage's belated disclosure to do so. Trial in this matter was not scheduled pending the instant decision on Defendants' motion for summary judgment. As such, there is no basis for finding trial has been delayed as a result of the late disclosure of Mr. Leach's supplemental report.

Finally, Defendants request that, in the event the Court does not exclude Mr. Leach from testifying at trial, it should award Defendants the attorney's costs and fees associated with being forced to bring the Motion in Limine. (Dkt. 76, p. 3.) The Court finds this is a more appropriate sanction than excluding Savage's expert witness. Plaintiff's counsel's repeated failure to meet important deadlines is clearly far from best practice and has forced upon Defendants the burden and expense of compelling compliance with scheduling order deadlines. The Court accordingly directs Defense counsel to file an affidavit setting forth fees and the amount of time expended on the Motion in Limine within seven (7) days from the date of this Order. Counsel for Savage has seven (7) days from the date of the filing of Defendants' affidavit to submit any objections to the requested attorneys' fees.

B.  *Motion to Strike*

Defendants also filed a Motion to Strike portions of the Declaration of T. Jason Wood, Exhibits, and Statement of Material Facts in Dispute filed in support of Savage's Opposition to Defendants' Motion for Summary Judgment. (Dkt. 81.) The Court did not rely upon the cited portions of Savage's counsel's declaration and Statement of Material Facts in Dispute in deciding Defendants' Motion for Summary Judgment, and therefore

denies the Motion to Strike as moot. Any disputes over admissibility of exhibits will be decided at trial.

**ORDER**

For the reasons stated herein, Defendants' Motion for Summary Judgment (Dkt. 25) is **GRANTED** in part and **DENIED** in part. Summary Judgment is **GRANTED** and judgment is entered for all Defendants with respect to Savage's intentional and negligent infliction of emotional distress claims, as well as with respect to Savage's civil assault and battery and/or false imprisonment and false arrest claims.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 25) is **DENIED** with respect to Savage's Fourth Amendment claim against all Defendants and negligent supervision and training claim against the city of Twin falls and Police Chief Pike.

Defendants' Motion in Limine (Dkt. 72) is **DENIED** to the extent it seeks exclusion of Savage's expert witness. However, Defendants are awarded the attorney's costs and fees associated with bringing the Motion in Limine, and are directed to file an affidavit setting forth fees and the amount of time expended on the Motion in Limine within seven (7) days from the date of this Order. Savage's counsel has seven (7) days from the date of the filing of Defendants' affidavit to submit any objections to the requested attorneys' fees.

Defendants' Motion to Strike (Dkt. 81) is **DENIED as MOOT**.

Trial in this matter is hereby scheduled to begin August 25, 2015 at 9:30 a.m.  If the parties would like a settlement conference before trial, they are directed to contact the Court's ADR coordinator, Keith Bryan.

SO ORDERED.

DATED: April 13, 2015

Edward J. Lodge
United States District Judge